IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

SYLVESTER EKWUNIFE,           : CIVIL ACTION NO. 16-00148
                              :
                 Plaintiff    :
                              :
                              :
                              :
                              :
                              :
                              :
        v                     :
                              :
                              :
                              :
                              :
                              :
                              :
                              :
CITY OF PHILADELPHIA,         :
et al,                        : Philadelphia, Pennsylvania
                              : October 14, 2016
                 Defendants   : 2:02 p.m.


- - -

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE EDUARDO C. ROBRENO
UNITED STATES DISTRICT JUDGE


- - -

APPEARANCES:

For the Plaintiff:     WARREN R. HAMILTON, ESQUIRE
                       Hanson Square
                       328 Fitzwater Street
                       Philadelphia, PA  19147


For Defendant City     BROCK ATKINS, ESQUIRE
of Philadelphia:       City of Philadelphia
                       Law Department
                       1515 Arch Street
                       14th Floor
                       Philadelphia, PA  19103


*Transcribers Limited*
*17 Rickland Drive*
*Sewell, NJ 08080*
*856-589-6100 • 856-589-9005*

2

1    APPEARANCES:          (Continued)

2    For Defendant          MICHAEL ROBERT SCALERA, ESQUIRE
     Philadelphia DA's      Philadelphia District Attorney's
3    Office:                Office, Civil Litigation Unit
                            Three South Penn Square
4                           13th Floor
                            Philadelphia, PA  19107
5
                               -  -  -
6
     Audio Operator:       Nelson Malave
7
     Transcribed By:       Mary Scarduzio
8
                               -  -  -
9
            Proceedings recorded by electronic sound
10   recording; transcript produced by computer-aided
     transcription service.
11
                               -  -  -
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      (The following was heard in open court at

2  2:02 p.m.)

3      THE COURT:  We are here today for a hearing

4  on the defendants' motion to dismiss the plaintiff's

5  third amended complaint.  Who wants to go first for the

6  defendants?

7      MR. ATKINS:  I will go first, Your Honor.  I

8  represent the City of Philadelphia, Brock Atkins.

9      THE COURT:  Okay.  Mr. Atkins, right?

10      MR. ATKINS:  Yes, Your Honor.  Yes, Your

11  Honor.

12      THE COURT:  Okay.  We read the papers, so

13  just give me the bottom line.

14      MR. ATKINS:  The bottom line, Your Honor, is

15  that the plaintiff has not identified past instances of

16  wrongdoing that would go to substantiate his claim that

17  there is a unconstitutional policy, practice or

18  procedure in the City of Philadelphia.

19      He does try to identify other instances where

20  judges have said that motions to dismiss are denied,

21  and motions for summary judgment are denied, but again,

22  these aren't findings of wrongdoing.

23      More importantly, these aren't findings of

24  wrongdoing in this particular case according to the

25  allegations in this case.

4

1       THE COURT:  Well, let me ask you this.  Let

2  me clarify a couple of things.  Number one, you haven't

3  moved to dismiss the case against Detective Hammond and

4  Police Officer Carter, is that right?

5       MR. ATKINS:  That is correct, Your Honor.

6       THE COURT:  Okay.  So, those are individuals

7  claims and we will handle them in the regular course of

8  business.

9       MR. ATKINS:  Yes, we will.

10       THE COURT:  So, your argument is a Monel

11  argument --

12       MR. ATKINS:  That is correct.

13       THE COURT:  -- is that what you're saying?

14       MR. ATKINS:  Yes, Your Honor.

15       THE COURT:  Okay.  So, what is the policy

16  that is at issue here?  Now, they said that the D.A.

17  was a policy maker.

18       MR. ATKINS:  Well, the D.A. is here, Your

19  Honor.  They are going to represent their interest in

20  this case.

21       THE COURT:  Okay.

22       MR. ATKINS:  They have been served now, I

23  believe.

24       THE COURT:  Okay.

25       MR. ATKINS:  I represent the City of

1  Philadelphia --

2            THE COURT:  So, what is your Monel argument

3  then?

4            MR. ATKINS:  My Monel argument is that the

5  plaintiff has not identified a policy, practice or

6  procedure, and beyond that he has to show evidence of

7  other wrongdoing.  It can't be one instance of

8  wrongdoing.

9            THE COURT:  Well, sometimes it could be one,

10  but not here.

11            MR. ATKINS:  Sometimes it can, you're

12  correct, Your Honor.

13            THE COURT:  Yes.

14            MR. ATKINS:  But, in this instance this act

15  was not egregious enough --

16            THE COURT:  Yes.

17            MR. ATKINS:  -- to constitute one instance to

18  show if there is a policy.  What he has shown is other

19  cases where judges have said we're going to deny a

20  motion to dismiss or deny a summary judgment motion,

21  but that's not proof of wrongdoing.

22            More importantly, the cases that plaintiff

23  cites to, the facts aren't even similar to this case.

24  What plaintiff needs to show is that a policy, practice

25  or procedure was a moving force that caused the alleged

6

1    constitutional violation to his client.

2         THE COURT:  And that if it had been in place

3    it would have prevented it from happening, right, and

4    it's failure to train, right?  In other words, if this

5    officer had been properly trained, this wouldn't have

6    happened.

7         MR. ATKINS:  I'm assuming that's his

8    allegation, yes, Your Honor.

9         THE COURT:  Yes.  Okay.

10        MR. ATKINS:  So, he has to show other

11   instances where there have been failure to train -- he

12   has to show proof of failure to train is a policy or

13   practice from the City of Philadelphia, naming other

14   cases where judges have said I'm denying your motion

15   for summary judgment on Monel doesn't prove that the

16   City has failed to train detectives --

17        THE COURT:  Right.

18        MR. ATKINS:  -- of how to properly complete

19   an affidavit, if that is even true.

20        THE COURT:  Right.  Okay.

21        MR. ATKINS:  And it's just a moving force,

22   and he hasn't identified the policy or hasn't

23   identified the failure to train, and hasn't shown how

24   that is a moving force that caused his client's injury.

25        THE COURT:  Okay.  Thank you.  Let me ask Mr.

1    Scalera, maybe these questions are more appropriate to

2    you.

3           MR. SCALERA:  Yes, Your Honor.

4           THE COURT:  Have you looked at the state

5    record as to what happened here?

6           MR. SCALERA:  I looked at it briefly.  I

7    pulled the file -- I couldn't pull the docket because

8    the record has been expunged, so even the court doesn't

9    have that docket.

10          THE COURT:  You mean it doesn't exist?

11          MR. SCALERA:  Not that I can find.

12          THE COURT:  So, how do we know what happened,

13    why it was dismissed or what were the circumstances?

14          MR. SCALERA:  We do have some of the

15    underlying records.  I'm speaking specifically about

16    the docket.  What some of our records show, and I am a

17    little nervous at getting beyond the four corners of

18    the complaint here, but just to paint with sort of a

19    broad brush, is that according to the A.D.A.'s records

20    this case came up for trial several times and each time

21    the marking on the file says C/R which stands for

22    "Commonwealth ready."

23          What happened each time was that either the

24    plaintiff's defense attorney had another trial and,

25    therefore, sought a continuance or the court itself in

1   the CJC had a trial and, therefore, required a

2   continuance and often these continuances can be six

3   months or longer.

4          But, according to our records and, again --

5          THE COURT:  So, the Speedy Trial Act doesn't

6   really doesn't work there in the sense of the Supreme

7   Court's pronouncement of how quickly these cases should

8   go to trial if there is a continuance granted.

9          MR. SCALERA:  That's correct, Your Honor.

10  And, again, I am not looking to --

11         THE COURT:  I am not holding you to it, but I

12  wanted to get a sense because if we don't have the

13  state record -- now, how did the case get expunged?

14  How does that happen?

15         MR. SCALERA:  Frankly, the plaintiff and

16  plaintiff's counsel may be able to speak to that in

17  terms of how they specifically went about it.

18         My understanding, and we have an expungement

19  unit that I am not a part of it, so --

20         THE COURT:  Yes.

21         MR. SCALERA:  -- I can't speak really

22  authoritatively on this, but I do believe that it's the

23  individual who makes a motion for expungement and then

24  the court makes a determination that --

25         THE COURT:  And the records sort of go away

1  at that point?

2        MR. SCALERA:  I think the court's records at

3  that point are destroyed in a case of an expungement.

4  Again, I am not really --

5        THE COURT:  Right.

6        MR. SCALERA:  -- the person to ask, but this

7  is my limited understanding of the expungement process.

8        THE COURT:  Okay.  So, what about the earlier

9  part of it, A.D.A. Gore, her role in it, what can you

10  say about that?

11        MR. SCALERA:  Well, what happened here,

12  according to the complaint, is that the victim which I

13  believe the complaint says was the plaintiff's

14  granddaughter accused him of raping her, and so the

15  police prepared an affidavit of probable cause and

16  arrest warrant, and A.D.A. Gore proceeded to prosecute

17  him based on the testimony or the statement of the

18  victim that her grandfather had raped her.

19        It does look like at least according to the

20  allegations of complaint, I having seen the charging

21  documents myself, but according to the allegations of

22  the complaint it does look like there are alleged

23  errors including the address of the plaintiff, the race

24  and sex of the plaintiff and by plaintiff I mean the

25  defendant in the --

10

1    THE COURT:  Yes.

2    MR. SCALERA:  -- underlying criminal case and

3  the --

4    THE COURT:  Age, I think, yes.

5    THE COURT:  -- age of the victim, which one

6  thing I do want to correct is apparently the charging

7  papers said the victim was 11 when according to the

8  complaint the victim was, in fact, four and in his

9  response to our motion to dismiss plaintiff says that

10  well, this makes a difference because no one would

11  believe that a man I think physiologically could rape a

12  four-year-old.  It saddens me to say --

13    THE COURT:  Yes.

14    MR. SCALERA:  -- that that is simply not

15  correct.

16    THE COURT:  Okay.

17    MR. SCALERA:  Four-year-old's are raped in

18  this country.

19    THE COURT:  Yes, yes.

20    MR. SCALERA:  It's a sad world we live in,

21  but those appear to be the errors.  Those errors are

22  not material to a determination of probable cause.

23    THE COURT:  Now, the circumstances of why the

24  case was dismissed, there was -- and I don't recall

25  exactly, what happened the day that the case was

11

1  dismissed, whether the plaintiff in this case, the

2  defendant in the criminal case, was offered a time

3  served sentence and when he didn't accept that then the

4  case was dismissed, how was that all fleshed out?

5          MR. SCALERA:  Well, again, we're going beyond

6  the four corners of the complaint, so I just want --

7          THE COURT:  Yes.

8          MR. SCALERA:  -- to be careful about not

9  transforming into a summary judgment motion.

10          THE COURT:  No, but I am asking you how do

11  you determine that?

12          MR. SCALERA:  What happened here, Your Honor,

13  is that on the first day of plaintiff's criminal trial

14  the victim or alleged victim recanted her story.

15          THE COURT:  Yes.  How old was she, 11 or

16  four?

17          MR. SCALERA:  I believe according -- the

18  complaint states that she was four and, again, we are

19  accepting that as true --

20          THE COURT:  Four plus then whatever --

21          MR. SCALERA:  Plus I suppose --

22          THE COURT:  -- in two or three that occurs

23  she would be about seven by then.

24          MR. SCALERA:  -- three years would make her I

25  believe seven.

12

1          THE COURT:  Yes.

2          MR. SCALERA:  So, my understanding from

3  looking over the file is that she recanted her story,

4  that she said that her mother told her to lie about

5  being raped at which point Ms. Gore nol prossed the

6  case.

7          THE COURT:  Okay.  Well, did she offer a time

8  served sentence?

9          MR. SCALERA:  I'm afraid I don't know, Your

10  Honor.

11          THE COURT:  Okay.  Is Ms. Gore still with you

12  or is --

13          MR. SCALERA:  No, Your Honor, she is no

14  longer with D.A.'s office.

15          THE COURT:  Okay.  But is around somewhere

16  here in Philadelphia, do you know?

17          MR. SCALERA:  I don't actually know, Your

18  Honor.

19          THE COURT:  So what's your -- what's the

20  legal defense here, at this point?

21          MR. SCALERA:  Well, as far as the claims that

22  I could suss (sic) out from the complaint though, it

23  looks like we certainly have a 1985 claim against the

24  D.A.'s office.

25          There are two problems with this claim.  The

13

first problem is that if you accept the Supreme Court's

parsing of the 1985 which is a fairly byzantine statute

of the five subsections that could be used to sustain a

1985 claim only to have been involved state interest,

the rest are interfering for federal election, federal

courts and of those two, the Supreme Court in Kush v.

Rutledge and in Griffin v. Breckenridge has made clear

that these are conspiracies that are based in equal

protection violations.

        THE COURT:  Right.

        MR. SCALERA:  Which require some sort of

allegation in the complaint that there has been a

discriminatory animus or motivation.

        THE COURT:  A racial motivation?

        MR. SCALERA:  Racial or some other protected

class.

        THE COURT:  Okay.

        MR. SCALERA:  That's not -- none of that is

alleged in the complaint.  I'm assuming that it would

be racial, but it could be, I imagine, other protected

classes as well.

        In this case, I think we would be dealing

with race as a protected class and the problem is that

there's simply no allegation in the complaint that

there has been any sort of --

14

1          THE COURT:  Right, I agree.

2          MR. SCALERA:  -- discriminatory motivation

3     and I don't think there could be consistent with

4     plaintiff's obligations under Rule 11.  So, that right

5     there just nullifies --

6          THE COURT:  Okay.  That takes care of 1985,

7     so what else?

8          MR. SCALERA:  Yes, I do want to make the

9     point that I raised the intercorporate conspiracy

10    doctrine.  I don't think we really need to get into

11    that.

12         THE COURT:  Right.

13         MR. SCALERA:  The plaintiff's defense to that

14    is that well, under Carter v. City of Philadelphia, Ms.

15    Gore was acting and the D.A.'s office and was acting in

16    a prosecutorial capacity which makes them a

17    representative of the state and not a representative of

18    the City.

19              If that were the case, then the entire claim

20    against the D.A. defendants would be barred by the

21    Eleventh Amendment.  Either we represented the City or

22    we represent the state.  There is no daylight between

23    those and if we represented the state, then all the

24    claims against us would be barred under the Eleventh

25    11th Amendment because it would be an action for money

15

damages against the state.

THE COURT:  How about absolute immunity for prosecutorial decisions, does that fold in here at all?

MR. SCALERA:  It does because there are cases I believe, I cited a few in my papers, but there are -- and, in fact, I think I dropped a footnote.  I'm usually not a string site fan, but in this case, it seemed appropriate to list all of the cases showing that when it comes to malicious prosecution, false arrest or really any cause of action that arises out of a prosecutor's decision to charge a defendant, that is inherently prosecutorial and, of course, under Ambler v. Pacman (ph) and, as Your Honor himself, recognized in the order dismissing the D.A. defendants under 1915, that this is quintessentially prosecutorial conduct in deciding to bring charges against a defendant.

So, if it is prosecutorial, then again, it's black-letter law that there is absolute prosecutorial immunity.  Now, interestingly in his response, plaintiff's defense to this is well no, you were acting in an administrative capacity.  Earlier, when we were discussing intra-courtroom conspiracy doctrine, he said we were acting ia prosecutorial capacity and, therefore, were agents of the state.

Now, plaintiff can't have it both ways here.

16

1    Either we are acting in a prosecutorial capacity or we

2    were acting in an administrative capacity.  The case

3    law is, I don't want to go out on a limb and say

4    unanimous, but I would say I have not seen any case

5    finding that the decision to charge a defendant by a

6    prosecutor is anything other than prosecutorial

7    behavior.

8            THE COURT:  Now that would apply to the

9    Assistant D.A., right?

10           MR. SCALERA:  Yes.

11           THE COURT:  Or does that apply to D.A.

12   Williams as well?

13           MR. SCALERA:  No, an action against the

14   District Attorney is in his official capacity and,

15   again, the claim against Seth Williams here is an

16   official capacity claim only.  There is no individual

17   capacity claim.

18           THE COURT:  So, the claim there is a Monel

19   claim?

20           MR. SCALERA:  Yes, it's a claim against the

21   D.A.'s office.

22           THE COURT:  Failure to train.  Now who was he

23   supposed to train, the D.A. or the police?

24           MR. SCALERA:  Well, certainly taking the

25   D.A.'s office as its own separate entity, certainly the

17

1   District Attorney has no authority, ability or what

2   have you to train the police.  So, it would have to

3   be --

4            THE COURT:  So it would be a claim that he

5   failed to train the Assistant D.A.?

6            MR. SCALERA:  That would have to be the

7   claim, Your Honor, but that claim would have to --

8            THE COURT:  But if the Assistant D.A. has

9   absolute immunity acting a prosecutorial capacity,

10  isn't that either moot or somehow -- how can he be

11  charged with failing to train a subordinate who was

12  then absolutely immune?

13           MR. SCALERA:  There is some discussion in the

14  case law, and it's an interesting issue that I don't

15  think has been fully fleshed out by the courts, because

16  it does seem, I agree with Your Honor that it's a

17  little incongruous that an Assistant D.A. can be

18  absolutely immune from liability for prosecutorial

19  actions, but then you can tag the municipality or the

20  agency with Monel liability for liability from which

21  the individual A.D.A. is absolutely immune.

22           I agree that that's an incongruity.  I think

23  and I'm running off memory here, but certainly in

24  individual claims capacity if, for example,

25  hypothetically speaking, there had been an individual

18

1   capacity claim against the D.A. here --

2          THE COURT:  Yes.

3          MR. SCALERA:   -- he would also share that

4   absolute immunity, and since we're going hypothetical,

5   this isn't in my briefing, but I think the Supreme

6   Court's decision in <u>Van De Kamp versus Goldstein</u> for

7   which I don't unfortunately have the site off the top

8   of my head.

9          THE COURT:  Well, you not well-prepared,

10  then.

11         MR. SCALERA:  Clearly, I'm a failure as a

12  lawyer, Your Honor, and I'm disgracing your courtroom.

13         THE COURT:  Yes.  Okay.  Yes.

14         MR. SCALERA:  But if there hypothetically

15  were an individual claim against the D.A., then I think

16  under <u>Van De Kamp</u>, the D.A.'s immunity would kick in.

17         THE COURT:  Well, for example, if you have no

18  constitutional violation, just by way of analogy on the

19  agent, you could not then proceed with a supervisory

20  liability.

21         MR. SCALERA:  No, no, there has to be an

22  underlying constitutional violation.

23         THE COURT:  Yes.

24         MR. SCALERA:  And that goes back to the fact

25  that under Monel, the policy or custom at issue has to

19

1   have caused some sort of injury to the plaintiff.

2           THE COURT:  So, what's your bottom line on

3   Monel?  Where is the -- where does it break the chain

4   here?

5           MR. SCALERA:  The bottom line on Monel is

6   there are no facts in the complaint to suggest any sort

7   of policy or custom and if we tease out policy and

8   custom, obviously a policy -- the 1983 treatises make

9   the point that a policy is the easiest thing on earth

10  to prove because it's usually some sort of written

11  document or public statement by the policy-maker, in

12  this case, the District Attorney, saying it is our

13  policy to ...

14          So, there's no allegation of such a policy

15  here, there are no facts, I should say.

16          THE COURT:  Is there a custom here?

17          MR. SCALERA:  Not in the complaint.  In order

18  to show a custom, again, under Iqbal and Twombley

19  there has to be an allegation of facts, not simply,

20  conclusions.

21          In this respect, I would commend to the Court

22  the Third Circuit's decision in  LeBlanc versus Stedman

23  which we cite in our papers.  This is a case that is

24  almost exactly like this case.  It's a -- it is a

25  plaintiff who was charged by police and Assistant

20

1  D.A.'s with, I think, in that case it was the crime of

2  insurance fraud and then eventually the case was nol

3  prossed and the defendants/plaintiff came and sued the

4  A.D.A.'s and county and the police for malicious

5  prosecution, false arrest, false imprisonment, all the

6  things that appear in this complaint.

7          But, what he did in that complaint mirrors

8  exactly what happened in this complaint where he said

9  here's what the individual A.D.A. did wrong and for

10  that, the Third Circuit found there was absolute

11  immunity.

12          By the way, everything that the A.D.A. did,

13  the county had a policy custom and practice of doing

14  that.  There are no facts, either in LeBlanc or in this

15  case, that could lead a court to conclude that there is

16  any chance that there might be a right to compensation

17  here.

18          THE COURT:  No.  One other question here and

19  this may not be in the complaint, and I don't know who

20  would have the burden of showing this, there is no date

21  when the defendant was arraigned.

22          MR. SCALERA:  Not in the complaint, Your

23  Honor.

24          THE COURT:  Okay.

25          MR. SCALERA:  I can and again --

21

1    THE COURT:  Now, is that a statute of

2  limitations issue?

3    MR. SCALERA:  I think it is a problem for

4  plaintiff in terms of --

5    THE COURT:  Does he have the burden to put

6  that in a complaint or is that an affirmative defense

7  that you would come forth with?

8    MR. SCALERA:  Well, the statute of

9  limitations is an affirmative defense.  Courts are

10  fairly clear that when the face of the complaint makes

11  it clear that an action is untimely --

12    THE COURT:  But we don't know here.

13    MR. SCALERA:  Well, what we do know is that

14  in Pennsylvania State Courts, a preliminary arraignment

15  occurs typically within 24 hours of arrest and, at

16  most, 72 hours.  A preliminary hearing typically takes

17  place seven to ten days later.

18    THE COURT:  Is that pursuant to the Supreme

19  Court mandate rule?

20    MR. SCALERA:  Those are in the -- the

21  federal, not federal, the Pennsylvania Rules of

22  Criminal Procedure and I have the exact rule in here

23  somewhere.  Those rules state, I think it's, yes, under

24  Rule 516(a) of the Pennsylvania Rules of Criminal

25  Procedure, preliminary arraignment was required to

22

1    happen "without unnecessary delay."  Now, we don't have

2    an exact date for his preliminary arraignment, but in

3    order for the statute of limitations to not bar the

4    plaintiff's action here, we would have to believe the

5    plaintiff was arrested and received no preliminary

6    arraignment for almost two years.

7         THE COURT:  A year and a half, I think it is

8    maybe, isn't it?

9         MR. SCALERA:  I believe and I don't recall

10   the dates off the top of my head, but I believe it was

11   almost four years after his arrest --

12        THE COURT:  Yes.

13        MR. SCALERA:  -- that this action was filed.

14   Now, that doesn't affect malicious prosecution, because

15   that was Hecht barred but the Supreme Court has been

16   clear that false imprisonment and false arrest causes

17   of action accrue on the date that the defendant is held

18   over pursuant to legal process.

19        THE COURT:  That would apply to the

20   individuals, but how does that fold in with the D.A.?

21   In other words --

22        MR. SCALERA:  Well, again, one needs to

23   show --

24        THE COURT:  -- the Monel claim would be

25   barred by the statute of limitations, as far as the

23

1  D.A. is concerned?

2       THE COURT:  Well, setting aside the malicious

3  prosecution aspect of it, any Monel claim that was

4  based on a false arrest or false imprisonment would be

5  because, again, the injury needs to occur.

6       THE COURT:  How about failure to train the

7  assistant D.A. if there was such a claim to proceed.

8  Would that also be barred?

9       MR. SCALERA:  Yes, Your Honor, because again,

10  at the time of the injury and the injury here allegedly

11  was --

12       THE COURT:  Well, when was the charge

13  decision made by the D.A., at what point in time?

14       MR. SCALERA:  I actually am afraid I can't

15  answer that with any precision, Your Honor.  I imagine

16  at some point after the A.D.A. who has been assigned to

17  the matter as presented with the charging papers, but I

18  don't know if there is necessarily --

19       THE COURT:  Okay.  Well, let's take an

20  ordinary crime.  Somebody is arrested off the street,

21  the police writes up, the charge is sent to the

22  Assistant D.A. on duty or over there.  Is that when it

23  happens, the charge decision that is made at that

24  point?

25       MR. SCALERA:  When it's presented to the

24

1  A.D.A.?

2          THE COURT:  Yes.

3          MR. SCALERA:  I, again, can't really answer

4  that.

5          THE COURT:  Now from then, you go to the

6  arraignment?

7          MR. SCALERA:  Yes, so once the decision is

8  made to charge, which I would imagine would have to be

9  made fairly quickly.  I don't think in this country,

10  we're allowed to simply arrest people and hold them in

11  jail for months on end without any decision to charge.

12  I think you need to either charge them and arraign them

13  and have a neutral magistrate make a determination of

14  probable cause or you have to let them go.

15          So, the decision to charge is made.

16          THE COURT:  Well now, wouldn't the charge

17  decision, it wouldn't necessarily have been made by the

18  Assistant D.A. Gore.  Would that have been made by the

19  Assistant D.A. on duty?

20          MR. SCALERA:  I think that initially would go

21  to our charging unit.

22          THE COURT:  Yes.

23          MR. SCALERA:  That's my belief of how it

24  happens, because again, typically a preliminary

25  arraignment is going to happen within 24 hours of

1  arrest, so as a general matter charging decisions, I

2  think, are made very quickly.  If something comes in at

3  night where A.D.A. Gore is at home asleep --

4            THE COURT:  Right,  That's what I mean, yes.

5            MR. SCALERA:  -- that's why we have a 24-hour

6  charging unit.

7            THE COURT:  So, after the individual is

8  arraigned, then this case would be assigned to whatever

9  unit, for bank robbery or whatever it is --

10           MR. SCALERA:  Yes, in this case, it would

11  be --

12           THE COURT:  That's when the Assistant D.A.

13  would get the case, at that point.

14           MR. SCALERA:  I believe so and in this case,

15  it would have gone to the Family Violence Unit and, of

16  which, A.D.A. Gore was a member.

17           THE COURT:  Okay.

18           MR. SCALERA:  Then within seven to ten days,

19  on average,you would have a preliminary hearing and

20  then the case would proceed from there.

21           THE COURT:  Okay.  So I understand that.

22  Thank you, Mr. Scalera.

23           Mr. Hamilton, welcome.

24           MR. HAMILTON:  Yes, Your Honor.

25           THE COURT:  What do you think?

26

1      MR. HAMILTON:  Well, it was suggested that a

2  policy of the D.A. was something that should have been

3  included in our complaint, but we aren't privy to that,

4  we weren't privy to that at the time we filed it.  We

5  would have an opportunity with interrogatories and with

6  depositions to flush the policy out.

7      My client spent three years in jail, the case

8  was dropped on the date he was supposed to go to trial

9  saying that the witness had recanted.

10     THE COURT:  Right.

11     MR. HAMILTON:  That speaks to investigation.

12 It speaks to why wasn't this case investigated and

13 vetted earlier?  There is a sexual, I don't know the

14 proper name, but there's a unit --

15     THE COURT:  Yes.  Family unit, I think he

16 called it.

17     MR. SCALERA:  Family Violence.

18     MR. HAMILTON:  I practiced for a long time

19 and I've, on occasion, taken accused people to office

20 the D.A. had on -- near -- on Lehigh Avenue, the

21 hospital there at 20th & Lehigh, down at that area, but

22 it was a unit that was specifically designated to

23 handle cases where sexual misactivity, misdoings were

24 alleged.

25     In that case typically, they would call the

27

1   person who hadn't been charged, but was accused, to

2   come in so they could interview him.  So, it was

3   different from a lot of other criminal cases where a

4   person makes a charge, they go arrest him and the

5   process is ongoing.

6          So, by having that kind of facility, there

7   are rules, I'm sure, of investigating these kind of

8   cases separate from other cases and we don't know that

9   right now to bring them-- you know, to bring it to the

10  Court, but if we have the opportunity to explore, I'm

11  sure we would find out what we're looking for.

12         I say that the D.A. addressed this by setting

13  up this special office, so to speak, to handle these

14  kinds of cases and it was my client's allegation all

15  along that this child was being used by the mother, who

16  had psychological problems, and nobody would listen to

17  him.

18         So, it's been three years and they found out

19  there was a problem, she said that the mother forced

20  her and she recanted her statement.

21         THE COURT:  Well, are you saying that, as you

22  sit here today, you don't know what that policy is,

23  because I don't think -- that wouldn't fly.

24         MR. HAMILTON:  No, I'm saying that the policy

25  was not one where D.A.'s were trained or there was some

1  sort of protocol where they had to follow-up

2  allegations in a particular in terms of the best scene.

3       In fact and I think in this case, the

4  defendant in the criminal case, was never called to

5  this office for an interview. There were other people

6  who would have been witnesses who were never called.

7  So, if there was a policy, they did adhere to the

8  policy.

9       We are alleging that it was broken and the

10  brokenness of the system harmed my client, harmed him

11  to the effect that he had to sit in jail for three

12  years.

13       So, if they had a policy, they should have

14  had a policy and if they didn't, that's a problem and

15  if they had a policy, they did not adhere to the policy

16  of evaluating or reevaluating this case over the course

17  of three years.

18       THE COURT:  Now, if you're given leave to

19  amend, do you have any facts which have not been pled

20  which will support these claims?

21       MR. HAMILTON:  I think in the complaint, we

22  mention the fact that the mother of the child, the

23  D.A.'s were told that she was -- she had mental

24  problems, that she was bipolar.

25       Obviously, that wasn't addressed or it wasn't

1   looked into or -- that's why we being this issue up, of

2   the lack of investigation.  That is a problem in this

3   case, that it was a problem in this case.

4          THE COURT:  Okay.  Let me ask Mr. Scalera.

5   As I understand Mr. Hamilton's theory here is that

6   after the defendant was arrested, there was a hiatus

7   there during which there was either no investigation or

8   an inadequate investigation.

9          In other words, he cannot point to a

10  particular piece of paper in the D.A.'s office that

11  said this is the way you do things.  I think he's sort

12  of showing that there is no piece of paper as to how

13  you do things and that is the absence of a policy in

14  itself, some kind of policy.  What's your reaction to

15  that?

16         MR. SCALERA:  Well, it sounds to me like a

17  failure to train claim --

18         THE COURT:  Right.

19         MR. SCALERA:  -- which brings us then right

20  back to Connick versus Thompson and single incident

21  liability.

22         Now, Your Honor referenced the City of

23  Canton, hypothetical earlier about when there might be

24  single incident liability for a failure to train, but

25  in Connick versus Thompson, the Supreme Court said

30

1  there could not be single incident liability for a

2  failure to train claim against prosecutors.   The

3  reasoning in that case was that unlike the City of

4  Canton, hypothetical where you're, let's say, you just

5  give a police office a gun and say all right, go get

6  them and then you don't train them on the

7  constitutional limitations on the use of deadly force,

8  that's a case where it's so obvious that you have to

9  train them.

10          By contrast, prosecutors have gone through

11  three years of law school, they've studied and passed

12  the Bar exam, they have taken CLE's and so what the

13  Supreme Court said is that unlike the city of Canton,

14  hypothetical, which would support single incident

15  liability, district attorneys' offices are allowed to

16  rely on lawyers' training unless there are other

17  incidents that show there is a problem.

18          Under Iqbal and Twombley, you have to allege

19  facts, not just conclusions that, oh there was a policy

20  in custom and failure to train, you have to allege some

21  sort of facts.

22          THE COURT:  Now, let's assume, under that

23  theory that it was Assistant D.A. Gore, just a

24  hypothetical, she did nothing.  She just showed up and

25  she didn't do an investigation.

1    Would she be covered by absolute immunity in

2  that she continued the prosecution of the case or would

3  that be an instance where the D.A. would fail to

4  supervise what A.D.A. Gore was doing?

5    MR. SCALERA:  If I'm following the question

6  here, I mean --

7    THE COURT:  There are two different

8  scenarios.  One is she does nothing as far as the

9  investigation, even though there may be a protocol

10 about what she is supposed to do, she does nothing.  Is

11 she individually liable?

12    MR. SCALERA:  Well, I think she would still

13 be subject to absolute immunity.  It would seem a

14 little incongruous to me to say that a prosecutor is

15 absolutely immune for their decision to charge a

16 defendant.  Then, somehow loses that immunity by

17 deciding to maintain that action and not drop it.

18 Choosing to charge and choosing to drop are just two

19 flip sides of the same coin.

20    THE COURT:  So, during that period of time,

21 no matter what you do, from the time you decide to the

22 time you drop, you're absolutely immune during that

23 period of time as a matter of policy, public policy?

24    MR. SCALERA:  I haven't seen any cases

25 specifically on that in my reading of the case law, but

32

1  come down one way or another simply because it's a
2  fairly unique fact pattern.
3       THE COURT:  Okay.  Well, so the second
4  point then is she did nothing, she may be absolutely
5  immune but we may be going back to the earlier point
6  but nobody supervised her and figure out that she was
7  doing nothing.  That is the D.A. who had the
8  responsibility for the office, did not supervise her
9  work, liable?
10       MR. SCALERA:  To the extent that the claim
11  appears in the complaint, no, not liable because the
12  complaint against the D.A. is an official capacity
13  complaint which means it has to meet the standards of
14  Monel which means you have to plead facts under Iqbal
15  and Twombley showing a policy of facts.
16       THE COURT:  So that would be only if there
17  was a claim of individual liability, such as a sergeant
18  over a police office, something along those line.
19       MR. SCALERA:  Perhaps, but then we get back
20  into what we were discussing earlier, Your Honor, as
21  far as if an individual A.D.A., acting in her
22  individual capacity, is entitled to absolute immunity,
23  then can a supervisor then in turn somehow be tagged in
24  their individual capacity with liability.
25       I think if you have a look at Van De Kamp

33

1  <u>versus Goldstein</u>, I think the Court will see that the

2  Supreme Court, pretty forcefully answered no and that

3  makes sense because it would again be incongruous to

4  say that an individual A.D.A.'s actions are

5  prosecutorial and, therefore, she's entitled to

6  absolute immunity, but the person supervising or

7  training that A.D.A. is not entitled to immunity and in

8  <u>Van De Kamp</u>, the Supreme Court said no, that would be

9  absolutely incongruous.

10         So, the District Attorney, if hypothetically

11  speaking or an individual capacity claimed here against

12  him, the D.A., I think, under <u>Van De Kamp</u>, would be

13  entitled to the exact same absolute immunity that

14  A.D.A. Gore is entitled to here.

15         THE COURT:  Okay.  Good, thank you.  Mr.

16  Atkins, do you want to add anything?

17         MR. ATKINS:  Yes.  Well, just in terms of

18  plaintiff's last claim, Your Honor, which was an

19  inadequate investigation --

20         THE COURT:  Yes.

21         MR. ATKINS:  -- this would be appropriate for

22  summary judgment at the end of this case, but there is

23  no constitutional right to a thorough investigation.

24  The prosecutor nor the police have any obligation to

25  seek out every witness plaintiff believes exonerates

34

1  him.  There's no right to that, so you can't base a

2  Monel claim on what he believes is failure, because the

3  constitution says it's not required.

4       THE COURT:  Okay.  Thank you.  Mr. Hamilton,

5  any final word?

6       MR. HAMILTON:  Well, from my client's

7  perspective is that the system failed him in the sense

8  that this case should have been resolved a lot earlier

9  or not even brought at all, and that he was harmed

10  being in jail for three years.

11      THE COURT:  What happened with all those

12  continuances, do you know?

13      MR. HAMILTON:  No, I don't.

14      THE COURT:  Okay.  He had a lawyer

15  representing him in the criminal prosecution, right?

16      MR. HAMILTON:  I understand that.  Well, I've

17  done a lot of criminal --

18      THE COURT:  You didn't represent him --

19      MR. HAMILTON:  No, I did not represent him.

20      THE COURT:  No.  Okay.

21      MR. HAMILTON:  But, I know that ordinarily

22  you have the 600 motion which is the being tried, that

23  after 360 days, 365 days in jail, you at least are

24  given -- in Philadelphia County they put you on a

25  bracelet, the anklet --

35

1          THE COURT:  Home detention.

2          MR. HAMILTON:  -- home detention but they

3  deny it, almost -- well some judges denied it, you

4  know, as a matter of course.

5          I've given the D.A. an opportunity that

6  continuances with a, saying that continuance -- with

7  the defendant's continuances so they stretch it out.

8  I don't know the history of this one and why that was,

9  in fact, --

10         THE COURT:  Okay.  This is what we are going

11  to do.  The complaint doesn't pass muster.  I think

12  that's clear except the two individual -- detective

13  Hammond and the police officer, who was involved here.

14  As to the others, it does not.  I think this is a

15  serious case, Officer Carter I meant to say.

16         Beyond that, it doesn't pass muster, but it

17  is a serious case and I want to be sure that we get to

18  the bottom of it.  The man is in jail for three years

19  and then the day of the trial, you know, it goes away,

20  I think is a serious matter, and you have only been in

21  the case, even though this is the third complaint,

22  you've only filed one complaint and --

23         MR. HAMILTON:  Yes, yes.

24         THE COURT:  -- maybe you didn't have an

25  opportunity to completely examine the circumstances

36

1   here.  I think this is what I'm going to do.  I'm going

2   to grant the motion with leave to amend as to all of

3   the defendants, except Detective Hammond and Office

4   Carter.

5            Now, when you file, if you do file, a fourth

6   amended complaint, I would like you to -- which is a

7   little difficult to follow the complaint as it is, to

8   identify each of the defendants and what claims you are

9   making against what defendants.

10           Then, that as to each defendant and the claim

11  against that defendant, identify the facts which

12  support your claim.  In other words, as against D.A.

13  Williams, these are the claims and these are the facts

14  that support the claims.  We ought to be able to then

15  review them once they have been properly laid out.

16           I do remind you that if you are going to

17  proceed on the basis of Monel, that it is important

18  that you identify what is the policy that you claim has

19  been violated.

20           I would then finally, point to Twombley and

21  Iqbal which represented, at least in terms of 1983

22  jurisprudence, maybe not so much in some of the

23  commercial cases, but as far as 1983 jurisprudence, it

24  does represent a C change to the extent that you cannot

25  simply say, let me take discovery and then I'll get the

37

1   facts to support my complaint.

2          Maybe the wisdom of that may be questioned,

3   but that is what it is.  We cannot allow a claim

4   to proceed unless you have sufficient facts which make

5   that claim plausible.  We also cannot accept the simple

6   conclusions or merely pointing to the elements of the

7   claim.

8          So, I'm sure you will make a valiant effort

9   to put this together in a way that would allow it to

10  proceed as to the other defendants.  So, I'm going to

11  give you 20 days, is that enough?

12          MR. HAMILTON:  Yes, Your Honor.

13          THE COURT:  Okay.  I'm going to give you 20

14  days to file an amended complaint and then we'll see

15  what's there.  Pending that, I think we will just

16  simply wait to see what happens before going ahead with

17  any of the other defendants in the case.

18          MR. HAMILTON:  Yes, Your Honor.

19          THE COURT:  Okay.  Anybody else, anything

20  else?  Okay.  Good.  Thank you.

21          ALL:  Thank you, Your Honor.

22          THE COURT:  We are adjourned.

23          (Proceedings adjourned, 2:47 p.m.)

24                    *  *  *

25

1
2
3
4
5
                          CERTIFICATION
6
7
8           I, Mary Scarduzio, hereby certify that the

9   foregoing is a correct transcript from the electronic sound

10  recordings of the proceedings in the above-captioned matter.

11
12
13  __3/8/17__                        _Mary Scarduzio_
    Date                              Mary Scarduzio
14
15
16
17
18
19
20
21
22
23
24
25